No. 25-1401

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CARRIE CONLEY, LOCKHART WEBB, ELLA KROMM, individually and on behalf of all others similarly situated; GABRIELA ADLER-ESPINO; and THE LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA,

*Plaintiffs-Appellants*,

v.

ALAN HIRSCH, JEFF CARMON, STACY "FOUR" EGGERS, IV, KEVIN N. LEWIS, and SIOBHAN O'DUFFY MILLEN, in their official capacities as members of the North Carolina State Board of Elections; and KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of North Carolina, No. 5:25-cv-00193-M-RJ

## EMERGENCY MOTION FOR STAY/INJUNCTION PENDING APPEAL
Response Requested by <u>Wednesday, April 23, 2025</u>

Jessica A. Marsden
Anne Harden Tindall
Protect Democracy Project
510 Meadowmont Village Circle, #328
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org
anne.tindall@protectdemocracy.org

John Paredes
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
john.paredes@protectdemocracy.org

Samuel Jacob Davis
Election Law Clinic at Harvard Law School
6 Everett Street
Cambridge, MA 02138
(631) 807-2327
sadavis@law.harvard.edu

Hayden Johnson
Protect Democracy Project
2020 Pennsylvania Avenue NW, #163
Washington, DC 20006
hayden.johnson@protectdemocracy.org

*Attorneys for Plaintiffs-Appellees Carrie Conley, Lockhart Webb, Ella Kromm, Gabriela Adler-Espino, and the League of Women Voters of North Carolina*

(Additional Counsel on Next Page)

Additional Counsel:

Stacey Leyton
Danielle Leonard
Juhyung Harold Lee
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
sleyton@altber.com
dleonard@altber.com
hlee@altber.com

*Attorneys for Plaintiffs-Appellees Carrie
Conley, Lockhart Webb, Ella Kromm,
Gabriela Adler-Espino, and the League
of Women Voters of North Carolina*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT .....................................................................2

RELIEF REQUESTED .........................................................................................3

STATEMENT OF CASE ......................................................................................4

SUMMARY OF ARGUMENT .............................................................................9

ARGUMENT ......................................................................................................11

   I.    Plaintiffs are likely to succeed on their claims that selectively applying new election rules to retroactively disenfranchise voters is unconstitutional. .............................................................................................12

       A.   Plaintiffs are likely to succeed on their due process claim....................12

       B.   Plaintiffs are likely to succeed on their equal protection claim.............15

       C.   Plaintiffs are likely to succeed even if this Court applies the *Anderson-Burdick* framework for assessing ex ante, nondiscriminatory voting burdens. .......................................................17

   II.   Plaintiffs will be irreparably harmed without a stay or injunction pending appeal. ...................................................................................................18

   III.  The balance of hardships favors Plaintiffs. ..................................................20

   IV.  Protecting voters' rights serves the public interest. ......................................21

   V.   The April 14 Text Order permitting Defendants to initiate the disqualify-then-cure process is appealable. ..................................................................22

CONCLUSION ...................................................................................................23

CERTIFICATE OF COMPLIANCE ..................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ................................................................................22

*Aggarao v. MOL Ship Mgmt. Co.,*
    675 F.3d 355 (4th Cir. 2012) .................................................................21

*Bennett v. Yoshina,*
    140 F.3d 1218 (9th Cir. 1998) ...............................................................13

*Burdick v. Takushi,*
    504 U.S. 428 (1992) .........................................................................10, 17

*Bush v. Gore,*
    531 U.S. 1046 (2000) .......................................................................10, 20

*Bush v. Gore,*
    531 U.S. 98 (2000) (per curiam) .......................................10, 15, 16, 17

*Carson v. Am. Brands, Inc.,*
    450 U.S. 79 (2017) ................................................................................22

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ..............................................................................18

*Democracy N.C. v. NCSBE,*
    476 F. Supp. 3d 158 (M.D.N.C. 2020) .................................................12

*Di Biase v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017) .................................................................21

*Dunn v. Blumstein,*
    405 U.S. 330 (1972) .................................................................15, 17, 22

*Elrod v. Burns,*
    427 U.S. 347 (1976) ..............................................................................20

*Gray v. Sanders,*
    372 U.S. 368 (1963) ...........................................................................2, 16

*Griffin v. Burns,*
    570 F.2d 1065 (1st Cir. 1978) ...........................................9, 13, 14, 15

*Griffin v. NCSBE,*
    24CV040620-910 (Wake Cnty. Sup. Ct. Feb. 7, 2025) .........................7

iv

*Griffin v. NCSBE*,
No. 25-1018 (4th Cir. Feb. 4, 2025)........................................................7

*Griffin v. NCSBE*,
No. 320P24-3, 2025 WL 1090903 (N.C. Apr. 11, 2025)......................8

*Griffin v. NCSBE*,
No. COA25-181, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025)........1, 7, 8, 18

*Harris v. McCrory*,
2016 WL 6920368 (M.D.N.C. Feb. 9, 2016).......................................19

*Hendon v. NCSBE*,
710 F.2d 177 (4th Cir. 1983)...................................................... passim

*Hoblock v. Albany Cnty. Bd. of Elections*,
487 F. Supp. 2d 90 (N.D.N.Y. 2006) ..................................................14

*Hunter v. Hamilton Cnty. Bd. of Elections*,
635 F.3d 219 (6th Cir. 2011).............................................................16

*Kim v. Bd. of Ed. of Howard Cnty.*,
93 F.4th 733 (4th Cir. 2024) .............................................................16

*Landgraf v. USI Film Prod.*,
511 U.S. 244 (1994).........................................................................13

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
2 F.4th 330 (4th Cir. 2021) .........................................................10, 19

*League of Women Voters of N. Carolina v. North Carolina*,
769 F.3d 224 (4th Cir. 2014).......................................................11, 19

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025) ...........................................................16

*Ne. Ohio Coal. for Homeless v. Husted*,
696 F.3d 580 (6th Cir. 2012).................................................14, 15, 18

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*,
354 F.3d 249 (4th Cir. 2003).............................................................11

*Nken v. Holder*,
556 U.S. 418 (2009)...........................................................................9

*Purcell v. Gonzalez*,
549 U.S. 1 (2006)..............................................................................22

*Ramirez v. Collier*,
595 U.S. 411 (2022) .........................................................................21

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ...................................................................12

*Republican Nat'l Comm. v. NCSBE*,
   120 F.4th 390 (4th Cir. 2024) ......................................................6

*Roe v. Alabama*,
   43 F.3d 574 (11th Cir. 1995)...................................................13, 14

*Sharma v. Hirsch*,
   121 F.4th 1033 (4th Cir. 2024) ....................................................6

*Wright v. North Carolina*,
   787 F.3d 256 (4th Cir. 2015)........................................................15

**Statutes**

28 U.S.C. § 1292 .............................................................................2

28 U.S.C. § 1331 .............................................................................2

N.C.G.S. § 143B-30.1(a) .................................................................5

N.C.G.S. § 150B-21.9(a)(1) ............................................................5

N.C.G.S. § 163-230.1(f1) ................................................................4

N.C.G.S. § 163-258.10 ....................................................................6

N.C.G.S. § 163-258.13 ....................................................................5

N.C.G.S. § 163-258.15 ....................................................................6

N.C.G.S. § 163-258.2(1) .................................................................4

**Regulations**

08 N.C. Admin. Code 17.0109(d) (2023).........................................5

08 N.C. Admin. Code 17.0109 (2024) .............................................5

Temporary Rule 08 N.C. Admin. Code 17.0109 (Dec. 16, 2019)...........5

**Other Authorities**

Fed. R. App. Proc. 8 ........................................................................3

**INTRODUCTION**

Plaintiffs-Appellants ("Plaintiffs") represent a proposed Class of qualified military and overseas voters whose ballots have been selectively deemed "not … properly cast" based on the discriminatory and retroactive application of a complete reversal of previously settled voting rules announced months after an election. *See Griffin v. NCSBE*, No. COA25-181, 2025 WL 1021724, at *15 (N.C. Ct. App. Apr. 4, 2025), *affirmed in relevant part*, No. 320P24-3, 2025 WL 1090903 (N.C. Apr. 11, 2025). Unless enjoined, Defendants-Appellees ("Defendants"), members of the North Carolina State Board of Elections ("NCSBE"), will imminently "omit from the final count the votes of those voters" who are targeted, unless the voters re-engage with county officials to "timely cure their deficiencies" in a "verification" process unprecedented in American elections. *See id.*

This post hoc upheaval of voters' reliance interests would be constitutionally problematic under most conditions. But it is flagrantly unconstitutional here, where the rule change completely disavows the rules in place at the time of the election; will be retroactively applied *more than five months after* the election; affects only the votes of a subset of military and overseas voters in areas the losing candidate targeted for partisan reasons; and forces voters to navigate an impromptu "cure" process with no recognition of the unique difficulties military and overseas voters *already* overcame to exercise their right to vote.

1

The ballots of these military and overseas voters are set to be selectively and presumptively invalidated. Absent further intervention from this Court, Defendants will soon implement an order (expressly permitted by the district court) to move Plaintiffs' votes from the "include" column, where they belong based on settled pre-election rules, to the "omit" column, because last fall they did not comply with a voter ID law that did not apply to them until last week.

The harms that flow from this impending disqualify-then-cure process are immediate and irreparable. In addition to exacerbating the voting burdens and arbitrary treatment Plaintiffs already face, the process deprives these voters of their constitutional "right to cast their ballots and have them counted" as cast. *Gray v. Sanders*, 372 U.S. 368, 380 (1963). And it casts a cloud of illegitimacy over the election that harms the electoral process.

A stay and injunction are necessary to meaningfully protect Plaintiffs' fundamental right to vote. The alternative would allow this right to devolve into a conditional one, where Plaintiffs' ballots count only if they can return five months after the election to comply with retroactive changes to the applicable rules.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. The court issued its order on April 14, 2025, and Plaintiffs timely appealed. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## RELIEF REQUESTED

Under Federal Rule of Appellate Procedure 8(a)(2), Plaintiffs seek a stay and an injunction concerning the district court's April 14 Text Order:

> This matter comes before the court on Plaintiff's motion for temporary restraining order [DE 11]. Pursuant to the court's authority under the All Writs Act, the motion is GRANTED IN PART. Defendants are ORDERED to proceed in accordance with the North Carolina Court of Appeals opinion, Griffin v. N.C. State Bd. of Elections, No. COA25-181, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025), as modified by the North Carolina Supreme Court in its April 11 Order, but SHALL NOT certify the results of the election, pending further order of this court.

Specifically, Plaintiffs seek a stay pending appeal of the portion of the district court's order directing Defendants to "proceed" with the disqualify-then-cure process ordered by the state courts, which will presumptively and discriminatorily invalidate Plaintiffs' votes. Plaintiffs further seek an injunction preventing Defendants, during this appeal, from (1) retroactively applying any post-election changes in election procedures to presumptively invalidate, encumber, or otherwise not count Plaintiffs' and the proposed Class's votes in the Seat Six election; and (2) requiring Plaintiffs and the Class to "cure deficiencies" created by the retroactive application of post-election changes in election procedures that currently prevents their votes from counting as cast.

## STATEMENT OF CASE

Plaintiffs are eligible, qualified military and overseas voters who voted in the 2024 election for Seat Six on the North Carolina Supreme Court in accordance with North Carolina's Uniform Military and Overseas Voter Act ("UMOVA"), and the League of Women Voters of North Carolina, whose members include affected UMOVA voters. Plaintiffs seek to protect their constitutional rights against a campaign to manipulate the election results by retroactively and selectively discarding their votes.

In March 2019, the General Assembly enacted a law requiring domestic civilian voters to present photo ID when voting. N.C.G.S. § 163-230.1(f1). This new requirement was codified in Article 20 of the state election laws, which by its terms applies only to domestic civilian voters. *Id.* A separate part of the code, Article 21A, establishes the UMOVA framework for overseas and military voters like Plaintiffs, consistent with the related federal law framework. *Id.* § 163-258.2(1). Article 21A does not include a photo ID requirement; UMOVA instead asks covered voters to submit an affirmation of their "identity, eligibility to vote, status as a covered voter, and timely and proper completion of an overseas-military ballot," *id.* § 163-258.4(e), which election officials verify and is subject to warnings that any "material misstatement" risks "a conviction of perjury." *Id.* §§ 163-258.13, 163-258.17(b).

4

To make the distinction clear, Defendants promulgated a temporary rule that "[a] covered voter" participating under the Article 21A UMOVA process "*is not required to submit a copy of acceptable photo identification*." Temporary Rule 08 N.C. Admin. Code 17.0109 (2019) (emphasis added), https://perma.cc/4D7A-K2LJ. After the voter ID law for domestic voters took effect, Defendants unanimously adopted another temporary rule on August 2, 2023, confirming the same exemption for UMOVA voters. 08 N.C. Admin. Code 17.0109(d) (2023). In March 2024, the Rules Review Commission (appointed by legislative leaders to check agency rulemaking) unanimously accepted this rule. *Conley*, ECF 12-9 ¶2; *see also* N.C.G.S. §§ 143B-30.1(a), 150B-21.9(a)(1). The General Assembly's Joint Oversight Committee, which reviews approved agency rules, did not object. *Conley*, ECF 12-8 ¶3. The exemption rule became permanent on April 1. 08 N.C. Admin. Code. 17.0109.

Under these rules, Defendants and county officials made it widely known that the photo ID requirement did not apply to UMOVA voters. *Conley*, ECF 12-8 (collecting at least ten statements and instructions). Plaintiffs reasonably relied on these assurances. *Conley*, ECF 12-2, Conley Decl. ¶¶9-11; ECF 12-3, Webb Decl. ¶¶10-12; ECF 12-4, Kromm Decl. ¶¶8-12, 15, 21; ECF 12-6, Pierce Decl. ¶¶11-14. They had no choice: virtually all UMOVA voters used a state or federal voting procedure that offered no mechanism to submit their photo ID. *Conley*, ECF 12-8,

5

Johnson Decl. ¶¶6, 13, 21; ECF 12-7, Cooper Expert Rep. at 5; N.C.G.S. §§ 163-258.10 (describing "electronic transmission"), 163-258.15.

In 2024, North Carolina was "flooded with dozens of challenges to the State's electoral regulations" that heavily scrutinized the voting process. *Sharma v. Hirsch*, 121 F.4th 1033, 1043 (4th Cir. 2024); *Republican Nat'l Comm. v. NCSBE*, 120 F.4th 390, 399 (4th Cir. 2024) (pre-election challenge to 225,000 registrations). Yet there were no challenges to the rule—established for years, communicated widely, and unanimously approved—that the photo ID law did not apply to military and overseas voters. The first time anyone contested this rule was when Griffin filed election protests *weeks after* the election, after multiple recounts confirmed his loss. Even then, Griffin only timely protested a subset of UMOVA votes in one predominantly Democratic county (Guilford)—*not* UMOVA voters in 99 other counties—where the election results indicated that the incumbent, Justice Riggs, had outperformed Griffin. *Riggs*, ECF 1-4 at 2, 12, n.2 (NCSBE Decision), ECF 61 (NCSBE Notice).[1]

---

[1] The NCSBE explained that because Griffin only timely protested (approximately 1,409) UMOVA voters in Guilford County, only those voters are at issue. However, on April 16, Griffin filed a mandamus petition in state court arguing that his protests challenged (approximately 8,600) UMOVA "voters in six counties": "Guilford, Durham, Forsyth, Buncombe, Cumberland, and New Hanover." *See* Ex. A. Any dispute over the number of counties is no barrier to this Court ruling on the federal issues presented. Whether it is one, four, or six counties, Plaintiffs' arguments are the same: the Constitution prohibits the NCSBE from retroactively and selectively encumbering the rights of *any* of these voters.

6

After removal proceedings in this Court that preserved jurisdiction over the federal issues presented, the matter returned to state court. Order at 5-11, *Griffin v. NCSBE*, No. 25-1018 (4th Cir. Feb. 4, 2025), ECF 132. The superior court held a hearing—at which zero evidence of any targeted UMOVA voter being ineligible to vote or committing fraud of any sort was presented—and promptly ruled against Griffin. *Griffin v. NCSBE*, 24CV040620-910 (Wake Cnty. Sup. Ct. Feb. 7, 2025).

A state court of appeals majority, analyzing only state law issues, reversed. *Griffin*, 2025 WL 1021724, at *12. It interpreted state law to conclude that the photo ID requirement for domestic civilian absentee voters also applied to UMOVA voters, despite longstanding rules and instructions to the contrary. *See id.* While Plaintiffs take no issue with that interpretation of state law as it is applied *prospectively*, the court of appeals went a step further, ruling that because the targeted subset of UMOVA voters did not anticipate that this rule would retroactively apply to them, "their ballots have not been properly cast" and thus must presumptively be "omit[ted] from the final count." *Id.* at *15.

To enforce its new rule in an election completed months ago, the court ordered Defendants to begin a plainly unconstitutional disqualify-then-cure process requiring counties to "expeditiously identify the military and overseas voters challenged under this protest" (*i.e.*, only in the county Griffin timely targeted), "notify said voters of their failure to abide by the photo ID requirement or

equivalent," and then "omit from the final count the votes of those voters" unless they "timely cure their deficiencies" in an invented "cure" procedure within "fifteen (15) business days." *See id.*

The state supreme court briefly stayed the mandate. On April 11, a 4-2 majority largely upheld the court of appeals decision but "expand[ed] the period to cure deficiencies arising from lack of photo identification or its equivalent from fifteen business days to thirty calendar days after the mailing of notice." *Griffin*, 2025 WL 1090903 at *3.

Riggs immediately sought injunctive relief to vindicate the federal rights of affected voters. Plaintiffs and others did the same on April 14. The district court denied each motion, directed Defendants to "proceed" carrying out the modified state court order, and sua sponte ordered Defendants to report their plans by April 15. The district court later issued an order to "clarif[y]" that, notwithstanding its prior "ORDER[]" that Defendants "proceed in accordance with the North Carolina Court of Appeals opinion," April 14 Text Order, "the only mandatory portion of [such order] is the language prohibiting the Board of Elections from certifying the results of election," *Riggs*, ECF 60 at 3. The court otherwise reaffirmed that it was denying Plaintiffs' requested relief to enjoin the disqualify-then-cure process, "which is now proceeding pursuant to the North Carolina Court of Appeals' order, as modified by the North Carolina Supreme Court." *Id.* On April 15, Defendants

8

reported their plans, *see Riggs*, ECF 61, for carrying out the disqualify-then-cure process, allow affected voters to "cure the deficiencies" before re-counting only the votes that it can "verify," *Griffin*, 2025 WL 1090903 at *3.

## SUMMARY OF ARGUMENT

A party seeking a stay or injunction pending appeal must show (1) likely success on the merits, (2) likely irreparable injury absent relief, (3) the balance of hardships favors the movant, and (4) granting relief serves the public interest. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009). Each factor favors Plaintiffs.

First, Plaintiffs are likely to succeed on their claims that retroactively and selectively applying changed voting rules, contrary to those in effect for the 2024 election, violates their due process, equal protection, and fundamental voting rights. Because the district court rejected Plaintiffs' and others' motions to enjoin Defendants from implementing the order to presumptively invalidate the affected votes, and to commence the process of requiring affected voters to take steps to "cure" the newfound "deficiencies," these voters' ballots are now in jeopardy. Due process forbids retroactively disenfranchising voters who complied with established voting rules based on post hoc changes to those rules. *Hendon v. N. Carolina State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (applying *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978)). Equal protection likewise forbids imposing these burdens on *only some UMOVA voters* but not the materially identical UMOVA

voters who cast ballots in other counties, solely because Griffin targeted those voters for partisan gain. *See Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (per curiam). Moreover, the presumptive invalidation of Plaintiffs' votes—and the burdensome cure process they must undertake to avert that invalidation—violates their fundamental right to vote because these severe encumbrances are not outweighed by any countervailing state interest. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

Second, "[b]ecause there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (quotations omitted). Presumptively invalidating Plaintiffs' votes, and then requiring them to clear additional hurdles not in place at the time of the 2024 election to avoid being disenfranchised, necessarily infringes upon "the right of qualified citizens to vote and to have their votes *counted as cast*." *Hendon*, 710 F.2d at 180 (emphasis added). Even if Defendants remain enjoined from certifying the Seat Six race, the burden imposed by rendering Plaintiffs' votes presumptively unlawful unless they engage further in a "cure" process is itself irreparable harm. *See, e.g.*, *Bush v. Gore*, 531 U.S. 1046, 1046-47 (2000) (Scalia, J., concurring).

10

Third, issuing the requested relief pending resolution of Plaintiffs' constitutional claims will not harm Defendants (or Griffin). While there may be a general interest in expeditiously certifying an election, that ship sailed long ago, after Griffin waited until after the election to file hundreds of protests based on theories he could have raised prior to any ballots being cast. Given Plaintiffs' likelihood of prevailing on their constitutional claims, the most equitable path to resolution is for this Court to answer the federal constitutional question of whether Defendants can retroactively invalidate an arbitrary subset of votes. Issuing the requested relief maintains the status quo pending that resolution to avert both substantial administrative strain on election officials and unconstitutional burdens on voters.

Fourth, the requested relief serves the public interest. Generally, "upholding constitutional rights serves the public interest." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). And "[b]y definition, '[t]he public interest favors permitting as many qualified voters to vote as possible,'" unencumbered by the conditions Defendants are ordered to impose on their rights. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citation omitted).

**ARGUMENT**

11

I. **Plaintiffs are likely to succeed on their claims that selectively applying new election rules to retroactively disenfranchise voters is unconstitutional.**

Plaintiffs are likely to succeed on their constitutional claims. Plaintiffs' "constitutionally protected right to vote … and to have their votes counted" is fundamental and "of the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964). The right is a "constitutionally protected liberty interest" that the Due Process Clause guarantees and that the Equal Protection Clause affords heightened protection. *Democracy N.C. v. NCSBE*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020) (collecting cases). Defendants' actions violate Plaintiffs' due process, equal protection, and voting rights.

A. **Plaintiffs are likely to succeed on their due process claim.**

Due process forbids Defendants from encumbering Plaintiffs' votes in a manner that takes "the election process [to] the point of 'patent and fundamental unfairness'" because doing so "erodes the democratic process." *Hendon*, 710 F.2d at 182 (quoting *Burns*, 570 F.2d at 1077). This prohibition applies even if the state's actions are mandated by a post-election court order. *See Burns*, 570 F.2d at 1078-79; *Roe v. Alabama*, 43 F.3d 574, 580-81 (11th Cir. 1995). Federal courts are authorized (and required) to prevent state officials from violating voters' due process rights, without regard to the ultimate merits of a state court's interpretation of state

12

law and whatever the state may do to implement changed rules prospectively. *See Burns*, 570 F.2d at 1073.

Defendants' actions violate due process for two independent reasons.

First, it is "settled" law in this Court that due process forbids applying changes to voting rules that were in effect during an election to retroactively discard votes cast and counted under established rules. *Hendon*, 710 F.2d at 182 (applying *Burns*, 570 F.2d at 1077). This prohibition is rooted in the Due Process Clause's "antiretroactivity principle": the government must "give[] people confidence about the legal consequences of their actions," and "settled expectations should not be lightly disrupted," *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265-66 (1994). Applying these principles, courts consider "(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be"; and "(2) significant disenfranchisement that results" from a departure from those rules. *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998) (distilling caselaw).

It is not seriously disputed that Plaintiffs followed the settled rules and instructions ahead of the election that they were *not* required to provide a copy of their photo ID. *Supra* at 4-6. Now, those rules have changed, and Defendants are ordered to apply them retroactively. *Supra* at 6-8. But Plaintiffs, as in *Griffin v. Burns*, voted in accordance with "long-standing practice" and "were doing no more

13

than following the instructions" of election officials. 570 F.2d at 1075-77. The

"retroactive invalidation" of their votes upends their protected reliance interests. *Id.*

at 1080. And at stake is, by any measure, the "significant disenfranchisement" of at

least 1,409 voters—a figure which may balloon to 8,600 voters if Griffin's untimely

protests are included. *See id.* at 1068 (123 votes); *Roe*, 43 F.3d at 578 ( "[b]etween

1000 and 2000 absentee voters"). Thus, under the *Hendon* and *Griffin* framework,

Defendants' retroactive application of changed election rules violates due process.

Second, due process prohibits election officials from punishing voters for

officials' own administrative errors because doing so is "fundamentally unfair." *Ne.*

*Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012); *accord*

*Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90, 94-96 (N.D.N.Y.

2006). Here, officials told Plaintiffs that the voter ID requirement did not apply to

UMOVA voters. *Supra* at 4-6 Even if such voters tried to comply anyway, they

lacked any official mechanism to do so. *Id*. If these instructions and mechanisms

were erroneous, as the state courts have concluded, due process still forbids

Defendants from presumptively disqualifying unsuspecting, qualified voters

because of election officials' own errors. *See Husted*, 696 F.3d at 591.[2]

---

[2] The state supreme court recognized an analogous state law principle and ordered Defendants to apply that principle to one group of voters targeted by Griffin, but not UMOVA voters. *See Griffin*, 2025 WL 1090903 at *2.

14

In these circumstances, "where the entire election process including … the state's administrative and judicial corrective process fails on its face to afford fundamental fairness," "federal judge[s] need not be timid, but may and should do what common sense and justice require." *Burns*, 570 F.2d at 1078. This requires issuing a stay and injunction pending appeal. Any other rule would "permit, if not encourage" what Griffin has done here: "lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Hendon*, 710 F.2d at 182 (quotations omitted).

**B.    Plaintiffs are likely to succeed on their equal protection claim.**

Defendants' retroactive application of new election rules to Plaintiffs' ballots, but not tens of thousands of ballots cast by other voters who are identically situated other than the county where they voted, epitomizes the "arbitrary and disparate treatment" of voters that the Equal Protection Clause prohibits. *Wright v. North Carolina*, 787 F.3d 256, 259 (4th Cir. 2015) (quoting *Bush*, 531 U.S. at 104-05).

Equal protection guarantees every voter's right "to participate in elections on an equal basis with other citizens," *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972), meaning the government cannot "value one person's vote over that of another," *Bush*, 531 U.S. at 104-05; *accord Mi Familia Vota v. Fontes*, 129 F.4th 691, 730 (9th Cir. 2025). The "constitutional concern" is acute in circumstances involving "discretion in areas 'relevant to the … counting of ballots'" because when the initial

15

vote tally is known, post-election targeting of *only some* ballots invites political mischief—on clear display here. *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 235 (6th Cir. 2011).

Defendants are ordered to unconstitutionally discriminate between Plaintiffs and similarly situated voters solely because of *where* they registered. Of the approximately 32,000 UMOVA votes cast in this contest, Defendants will presumptively invalidate, and potentially discard, only votes from populous, Democratic-leaning counties. It *will* count ballots cast in the same manner in all other counties, without requiring voters there to undergo the disqualify-then-cure process. This arbitrary differential treatment creates a "preferred class of voters" who happened to vote in counties Griffin left alone. *See Gray*, 372 U.S. at 379-80.

"[D]isparately treat[ing] similarly situated people" in a manner that "involves a fundamental right" like voting "must survive *exacting* judicial scrutiny." *Kim v. Bd. of Ed. of Howard Cnty.*, 93 F.4th 733, 740-41 (4th Cir. 2024) (emphasis added). The differential treatment of Plaintiffs from other UMOVA voters, based solely on where they voted, serves no legitimate state interest; it only serves Griffin's personal and partisan interests in discarding votes thought to largely favor Riggs. This fails even rational basis review because "'[f]encing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Dunn*, 405 U.S. at 355. The invented disqualify-then-cure process only exacerbates

the constitutional issue: presumptively invalidating votes cast by some voters and requiring only them (but not similarly situated voters) to "cure" their ballots is itself unlawful arbitrary and disparate treatment. The selective application of new rules and burdens to Plaintiffs unconstitutionally "value[s] one person's vote over that of another" and cannot stand. *See Bush*, 531 U.S. at 104-05.

### C.     Plaintiffs are likely to succeed even if this Court applies the *Anderson-Burdick* framework for assessing ex ante, nondiscriminatory voting burdens.

Plaintiffs are likely to prevail under the *Griffin v. Burns* and *Bush v. Gore* frameworks, described above, which this Court should apply. Plaintiffs would also prevail even if the Court were to consider their claims under the *Anderson-Burdick* balancing framework that applies to "nondiscriminatory" and *ex ante* (rather than *ex post*) government infringements of the right of "access to the ballot." *Burdick*, 504 U.S. at 434.

Arbitrarily and presumptively disqualifying Plaintiffs' ballots, despite their reasonable reliance on settled rules and official instructions, is a severe burden on the right to vote that must satisfy—and certainly fails—strict scrutiny. *See Husted*, 696 F.3d at 592. Even if the Court views the burden in lesser terms, minimal voting burdens must still "be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (quotation omitted). Here, however, there is no legitimate

countervailing state interest, there is no indicia of fraud, and all protested voters were eligible and qualified to vote. Voters will be affected based solely on a losing candidate's personal partisan interests. That arbitrary, illegitimate interest cannot outweigh the burdens that Plaintiffs and the proposed Class are forced to overcome.

## II.     Plaintiffs will be irreparably harmed without a stay or injunction pending appeal.

Defendants will soon initiate a process that immediately impairs Plaintiffs' fundamental rights. Without an injunction, Defendants will inform Plaintiffs and the proposed Class that their votes will be "omit[ted] from the final count" unless they "timely cure their deficiencies" in an impromptu thirty-day process. *Griffin*, 2025 WL 1021724, at *15. This imposes three types of irreparable harm, none of which is relieved by the district court's order prohibiting certification at this time.

First, the default rule that Defendants are poised to implement means that Plaintiffs' votes, previously *included* in the Seat Six tally based on the extant election rules, will now be presumptively "omit[ted]" from the count based on the changed election rules, absent further action from the voter. *See id.* This treatment itself abridges Plaintiffs' fundamental constitutional "right … to vote and to have their votes *counted as cast*." *Hendon*, 710 F.2d at 180 (emphasis added). And even if some voters could later re-secure their rights, "the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Beautiful Struggle*, 2 F.4th at 346.

18

Second, the encumbrances that the disqualify-then-cure process itself imposes on Plaintiffs and the proposed Class constitute irreparable injury. The process imposes added "restrictions on fundamental voting rights" that "Courts routinely deem … irreparable injury." *LWVNC*, 769 F.3d at 247. Moreover, arbitrarily requiring *some* voters to "cure their" newfound "deficiencies," but not *other* similarly situated voters, represents unequal treatment that is irreparable injury. *See Harris v. McCrory*, 2016 WL 6920368, at *1 (M.D.N.C. Feb. 9, 2016) ("[L]imiting the right to vote in a manner that violates the Equal Protection Clause[] constitutes irreparable harm."). Plaintiffs describe the difficulties they face in having their votes put in jeopardy and being forced to undertake actions to save their votes. Webb Decl. ¶¶14, 16-20; Conley Decl. ¶¶15-16; Kromm Decl. ¶¶14-21; Pierce Decl. ¶¶18-20; ECF 12-7, Rubin Decl. ¶¶15-18 (summarizing organizational injuries). And the reality is that these are the UMOVA voters who had the resources and wherewithal to seek legal counsel to protect their rights; others in the proposed Class have an even steeper hill to climb.

Third, the irreparable harm includes the confusion and cloud of doubt cast over the election and electoral process. As Justice Scalia recognized, the unequal and retroactive treatment of votes that will occur if the disqualify-then-cure process continues will "cast[] a cloud upon … the legitimacy of [t]his election" and the legitimacy of Plaintiffs' votes. 531 U.S. at 1046-47. Under Justice Scalia's logic,

19

permitting a disqualify-then-cure process "first, and rule upon legality afterwards, is not a recipe for producing election results that have the public acceptance democratic stability requires." *Id.*

The notion that the district court might, later on, prohibit Defendants from certifying results after the disqualify-then-cure process does not obviate the harms. For one, that entirely hypothetical future order does not change the fact that Plaintiffs' rights are being violated now, as soon as their lawfully cast and counted ballot is jeopardized. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (finding irreparable injury where constitutional interests were "either threatened or in fact being impaired"). Regardless, the burdens of the disqualify-then-cure process itself, and the "cloud" of illegitimacy Justice Scalia described, represent irreparable injuries sufficient to warrant Plaintiffs' requested relief, even if the district court ultimately rejects this unconstitutional gambit.

## III.   The balance of hardships favors Plaintiffs.

Issuing a stay and injunction pending appeal imposes no cognizable hardship on Defendants and effectively maintains the status quo: "the last uncontested status between the parties which preceded the controversy." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012). The election was conducted following settled rules. Defendants have already approved and counted these ballots, recounted them twice, and then canvassed the results following those rules. The new disqualify-then-

20

cure process Defendants are developing materially *changes* the status quo. Plaintiffs'
requested relief maintains the last-uncontested status.

Griffin also has no cognizable hardship. Given his lack of pre-election
challenge, he "has not shown that he availed himself of opportunities to avoid the
injuries of which he now complains." *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th
Cir. 2017). And he "can hardly complain about the inequities of delay when [his]
own actions were a significant contributing factor." *Ramirez v. Collier*, 595 U.S.
411, 435 (2022).

Thus, the equities are best served by deciding the constitutional issues first to
avert the irreparable injuries to Plaintiffs and the hardships imposed by Defendants
highly burdensome disqualify-then-cure process. *See Riggs*, ECF 61.

## IV.    Protecting voters' rights serves the public interest.

Because the only possible outcome of the disqualify-then-cure process will be
the presumptive disenfranchisement of at least some otherwise eligible and qualified
voters, allowing Defendants to begin that process is necessarily against the public
interest. Moreover, this process will undoubtedly "result in voter confusion," *Purcell
v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (quoting *Dunn*, 405 U.S. at 336)—confusion
that can be mitigated (or avoided) by first addressing whether Defendants can
discard *any* ballots based on the retroactive, disparate application of changed

election rules. The equities favor granting a stay and injunction pending resolution
of Plaintiffs' appeal.

## V.    The April 14 Text Order directing Defendants to proceed with the disqualify-then-cure process is appealable.

This Court has jurisdiction to issue Plaintiffs' requested relief under 28 U.S.C.
§ 1291(a)(1), which permits the immediate appeal of interlocutory orders "granting"
or "refusing … injunctions." "[T]he label attached to an order is not dispositive,"
*Abbott v. Perez*, 585 U.S. 579, 594 (2018), and an order with the "practical effect"
of granting or refusing an injunction is immediately appealable if it "(1) may have a
'serious, perhaps irreparable consequence' and (2) can only be 'effectually
challenged' through immediate appeal," *Carson v. Am. Brands, Inc.*, 450 U.S. 79,
83-84 (2017).

Here, Plaintiffs sought a TRO and/or preliminary injunction prohibiting
Defendants from retroactively applying changes to the election rules, presumptively
invalidating their votes under those retroactive rules, and requiring them to provide
additional verification to have their votes counted. *Conley*, ECF 13. Despite the
district court's suggestion to the contrary, the April 14 Text Order "ORDERED"
Defendants to commence the disqualify-then-cure process. Although the district
court later sought to "clarif[y]" that "the only mandatory portion" of its order is "the
language prohibiting [Defendants] from certifying the results," it acknowledged that
the order's effect was to deny Plaintiffs' requested injunction and permit the

disqualify-then-cure process to "proceed[.]" *Riggs*, ECF 60. The court then set a briefing schedule on further "federal issues" that will conclude *only after* the disqualify-then-cure process is well underway. *Riggs*, April 12 Text Order. Thus, for §1291(a)(1) purposes, the court has "refused" Plaintiffs' requested injunction prohibiting the *initiation* of such process. Because irreparable injuries will occur absent this Court's intervention, *see supra* at 18-20, this Court has jurisdiction and should grant the requested relief.

## CONCLUSION

Accordingly, Plaintiffs ask the Court to grant their motion for a stay and an injunction pending appeal.

Dated: April 17, 2025                    Respectfully Submitted,

                                         /s/ *Samuel Jacob Davis*
                                         Samuel Jacob Davis

                                         Samuel Jacob Davis
                                         Election Law Clinic at Harvard Law School
                                         6 Everett Street
                                         Cambridge, MA, 02138
                                         Telephone: (631) 807-2327
                                         sadavis@law.harvard.edu

                                         Jessica A. Marsden
                                         Anne Harden Tindall
                                         Protect Democracy Project
                                         510 Meadowmont Village Circle, No. 328
                                         Chapel Hill, NC 27517
                                         Telephone: (202) 579-4582
                                         Fax: (202) 769-3176

jess.marsden@protectdemocracy.org
anne.tindall@protectdemocracy.org

Hayden Johnson
Protect Democracy Project
2020 Pennsylvania Avenue NW, Suite #163
Washington, DC 20006
Telephone: (202) 579-4582
Fax: (202) 769-3176
hayden.johnson@protectdemocracy.org

John Paredes
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
Telephone: (202) 579-4582
Fax: (202) 769-3176
john.paredes@protectdemocracy.org

Stacey Leyton
Danielle Leonard
Juhyung Harold Lee
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
dleonard@altber.com
hlee@altber.com

*Attorneys for Plaintiffs-Appellees Carrie
Conley, Lockhart Webb, Ella Kromm,
Gabriela Adler-Espino, and the League of
Women Voters of North Carolina*

24

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that the foregoing document contains 5,152 words, not including items that may be omitted from the word count pursuant to Federal Rule of Appellate Procedure 32(f).

Dated: April 17, 2025                    /s/ *Samuel Jacob Davis*
                                         Samuel Jacob Davis

Exhibit A

No. 25-181                                   DISTRICT 10

## NORTH CAROLINA COURT OF APPEALS

**************************************

JEFFERSON GRIFFIN,

        Petitioner-Appellant,

   v.

NORTH CAROLINA STATE
BOARD OF ELECTIONS,

        Respondent-Appellee,

   and

ALLISON RIGGS,

        Intervenor-Respondent-
        Appellee.

From Wake County

**************************************

# PETITION FOR WRIT OF MANDAMUS AND ALTERNATIVE MOTION TO CLARIFY MANDATE

# IMMEDIATE RULING REQUESTED

**************************************

# INDEX

INDEX ................................................................. i

TABLE OF AUTHORITIES .................................................. ii

INTRODUCTION .................................................... 2

BACKGROUND ...................................................... 3

REASONS WHY THE WRIT SHOULD ISSUE OR
WHY THE COURT SHOULD CLARIFY THE
MANDATE ......................................................... 5

I.    This Court Retains Jurisdiction to Enforce Its Own
      Mandate ...................................................... 5

II.   The State Board Has Announced That It Will Not
      comply with This Court's Mandate. ............................ 6

      A.    The State Board is limiting the number of
            overseas voters subject to a cure process. .............. 7

      B.    The State Board is limiting the number of
            Never Residents. ...................................... 11

      C.    The State Board plans to give Never
            Residents a "cure" opportunity. ....................... 15

CONCLUSION ...................................................... 19

VERIFICATION .................................................... 21

CERTIFICATE OF SERVICE .......................................... 22

- ii -

## TABLE OF AUTHORITIES

**Cases**

*Collins v. Simms*,
        257 N.C. 1, 125 S.E.2d 298 (1962) ................................... 6

*D & W, Inc. v. City of Charlotte*,
        268 N.C. 720, 152 S.E.2d 199 (1966) ........................ 5, 17

*James v. Bartlett*, 3
        59 N.C. 260, 607 S.E.2d 638 (2005) ............................. 13

*Johnson v. Standard Sunco, Inc.*,
        111 N.C. App. 926, 435 S.E.2d 536 (1993) ..................... 6

*Murrill v. Murrill*,
        90 N.C. 120 (1884) ........................................................ 6

*Pue v. Hood*,
        222 N.C. 310, 22 S.E.2d 896 (1942) .............................. 6

*State v. Hasty*,
        181 N.C. App. 144, 639 S.E.2d 94 (2007) ...................... 6

*Tussey v. Owen*,
        147 N.C. 335, 61 S.E. 180 (1908) .................................. 6

**Statutes**

N.C. Gen. Stat. § 163-182.10 ................................................... 10

N.C. Gen. Stat. § 163-182.9 ................................................. 9, 10

**Treatises**

Elizabeth B. Scherer & Matthew N. Leerberg, *North Carolina
        Appellate Practice and Procedure* (2d ed. 2022) ............. 5, 6

No. 25-181                                              DISTRICT 10

## NORTH CAROLINA COURT OF APPEALS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JEFFERSON GRIFFIN,

      Petitioner-Appellant,

v.

NORTH CAROLINA STATE
BOARD OF ELECTIONS,

      Respondent-Appellee,

and

ALLISON RIGGS,

      Intervenor-Respondent-
      Appellee.

<u>From Wake County</u>

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PETITION FOR WRIT OF MANDAMUS AND ALTERNATIVE MOTION TO CLARIFY MANDATE

## IMMEDIATE RULING REQUESTED

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pursuant to Rules 22 and 37 of the Rules of Appellate Procedure, Petitioner
Judge Griffin seeks a writ of mandamus from this Court, or, alternatively, an order
clarifying this Court's mandate.

- 2 -

# INTRODUCTION

After the Supreme Court of North Carolina issued its opinion, this case returned to federal court. The U.S. District Court for the Eastern District of North Carolina ordered the State Board of Elections to explain how it intended to comply with this Court's mandate. The State Board filed a notice explaining its intentions on 15 April 2025. In its notice, the Board explained that it intends to defy this Court's mandate rather than comply with it.

The State Board informed the federal court that it will violate this Court's mandate in several respects. First, the State Board will instruct only a single county to offer a cure process to overseas voters who failed to present identification—despite protests being filed in six counties. Second, the State Board will only address 266 Never Residents named in Judge Griffin's protests—despite this Court ordering county boards to remove all Never Residents. Third, the State Board has created an elaborate cure process for the Never Residents—even though this Court clearly forbade a cure process for Never Residents.

The Board's intended defiance requires immediate redress by this Court. This Court should issue a writ of mandamus to the State Board, ordering it to faithfully comply with the mandate. Procedurally, this Court could also enter an order

- 3 -

clarifying its mandate. Either way, this Court should leave the State Board no room to circumvent the Court's directions.

## BACKGROUND

On 4 April 2025, this Court issued its opinion in the case, in which it ruled that Judge Griffin had correctly identified three legal errors in the State Board's administration of the election. As a result, the Court directed the State Board to implement a 15-day cure process for voters with incomplete-registrations, to implement a 15-day cure process for overseas voters who did not provide photo identification, and to discount the votes of Never Residents. The Court set its mandate to issue on 7 April 2025.

On 6 April 2025, Appellees filed petitions for discretionary review and motions to stay the Court's mandate with the Supreme Court of North Carolina. On 7 April 2025, the Supreme Court stayed the mandate.

On 11 April 2025, the Supreme Court of North Carolina denied Appellees' petitions for discretionary review, dissolved the stay, and remanded the matter for further proceedings not inconsistent with the Supreme Court's order. The Supreme Court's order affirmed this Court's conclusion that the State Board had violated the law but ruled that voters with incomplete registrations should nonetheless be allowed

- 4 -

to vote in the election and it extended the cure period for overseas voters to 30 days. Otherwise, this Court's mandate remained in place.

On 11 April 2025, Justice Riggs filed a motion for a preliminary injunction with Chief Judge Richard E. Myers II of the U.S. District Court for the Eastern District of North Carolina. On 12 April 2025, Chief Judge Myers issued an order granting in part the request for injunctive relief. The order was as follows:

> Defendant North Carolina State Board of Elections is OR-DERED to proceed in accordance with the North Carolina Court of Appeals opinion, *Griffin v. N.C. State Bd. of Elections*, No. COA25-181, 2025 WL 1021724 (N.C. Ct. App. Apr. 4, 2025), as modified by the North Carolina Supreme Court in its April 11 Order, but SHALL NOT certify the results of the election, pending further order of this court.

On the same day, Chief Judge Myers ordered the State Board to file, on 15 April 2025, a "notice to the court of the scope of its remedial efforts, including the number of potentially affected voters and the counties in which those voters cast ballots."

On 15 April 2025, the State Board filed its notice. A copy of the notice is attached to this petition as Exhibit A (the "Notice").

- 5 -

## REASONS WHY THE WRIT SHOULD ISSUE OR WHY THE COURT SHOULD CLARIFY THE MANDATE

### I.   This Court Retains Jurisdiction to Enforce Its Own Mandate.

An appellate court always retains jurisdiction to ensure that its orders are obeyed.

When an appellate court issues its mandate, the mandate is binding "and must be strictly followed without variation or departure. No judgment other than that directed or permitted by the appellate court may be entered." *D & W, Inc. v. City of Charlotte*, 268 N.C. 720, 722, 152 S.E.2d 199, 202 (1966). If the mandate is not strictly followed, the appellate court that issued the mandate "retains jurisdiction of the original cause in every case for the purpose of effectuating its mandate." *Id.* In other words, "[t]he issuance of the mandate from this Court [does] not exhaust its jurisdiction to enforce its orders." *Id.*; *see also* Elizabeth B. Scherer & Matthew N. Leerberg, *North Carolina Appellate Practice and Procedure* § 18.01 n.5 (2d ed. 2022) ("Of course, the issuance of the mandate does not divest the appellate court of all jurisdiction. The appellate court retains the ability to, for example, enforce the mandate itself.").

This Court "may issue any appropriate writ or take the necessary steps to compel obedience to its mandate." *D & W*, 268 N.C. at 722, 152 S.E.2d at 202. That is true whether the lower official's lack of compliance arises through

- 6 -

"insubordination, misinterpretation or inattention." *Id.* (quoting *Collins v. Simms*, 257 N.C. 1, 10, 125 S.E.2d 298, 304 (1962)).

When this failure to obey a mandate occurs, the remedy is mandamus. *See, e.g.*, *Tussey v. Owen*, 147 N.C. 335, 61 S.E. 180, 181 (1908); *Murrill v. Murrill*, 90 N.C. 120, 124 (1884); *State v. Hasty*, 181 N.C. App. 144, 146, 639 S.E.2d 94, 95 (2007); *Johnson v. Standard Sunco, Inc.*, 111 N.C. App. 926, 926, 435 S.E.2d 536, 537 (1993); *see also* Scherer & Leerberg, *supra*, § 22.02[2][g] ("Mandamus can be used to force a judicial officer to comply with an order of the appellate court. Likewise, mandamus is appropriate to enforce compliance with the mandate of the appellate court."). Mandamus is the exercise of this Court's "original and not appellate jurisdiction." *Pue v. Hood*, 222 N.C. 310, 22 S.E.2d 896, 898 (1942).

As explained below, the State Board has announced its intent to defy this Court's mandate. This Court, therefore, should order the Board to comply with the mandate.

## II.    The State Board Has Announced That It Will Not comply with This Court's Mandate.

As revealed by the State Board's Notice to the federal court, the State Board is planning to disobey the Court's mandate. To be more specific, the Board plans to administer a cure process for overseas voters in only one county. The Board also intends to circumscribe the universe of ineligible Never Residents, even when this

- 7 -

Court ordered that all Never Residents be excluded. Lastly, the Board has devised a cure process that will permit ineligible Never Residents to vote in the election.

The Court should clarify its directions to the State Board so that the Board administers the actual remedy ordered by the Court.

### A.    The State Board is limiting the number of overseas voters subject to a cure process.

The State Board informed the federal court that it will administer a cure process for only 1,409 overseas voters in Guildford County. Overseas voters in all other counties will have their votes counted, despite Judge Griffin having filed protests in five counties other than Guilford.

Judge Griffin filed protests challenging overseas voters in six counties in which a local election official confirmed that the county board accepted overseas ballots without requiring photo identification. Those counties were Guilford, Durham, Forsyth, Buncombe, Cumberland, and New Hanover. (Doc.Ex.I 349-58, 831-40, 1102-11, 1504-51, 1238-47, 2401-10). When the protests were originally filed, only one county (Guilford) had provided a list of such voters, and this list was included with the protest filed in Guilford County. (Doc.Ex.I 1504-51.) In the six filed protests, Judge Griffin stated that the lists had been requested and, "[o]nce the information is provided, we will supplement the protest." (*E.g.*, Doc.Ex.I 350.) Since filing the protests, Durham, Forsyth, and Buncombe counties have provided their lists as well,

- 8 -

and the lists were filed as supplements to Judge Griffin's protests. (Doc.Ex.I 3790-4042.)

In its federal court filing, the State Board announced that it has decided that only Guilford County should conduct a cure process for the 1,409 overseas voters identified in the list submitted with the Guilford County protest. Notice at 2. The Board's decision to conduct a cure process in just one county violates this Court's mandate.

The Court's instructions explicitly directed the State Board to have *multiple* counties conduct a cure process for the overseas voters who did not provide photo identification. The Court said that the State Board must

> immediately direct *the county boards* to expeditiously identify the military and overseas voters challenged under this protest and notify said voters of their failure to abide by the photo ID requirement or equivalent, to allow said voters fifteen (15) business days from the mailing of the notice to cure the defect, and upon verification, to include in the count of this challenged election the votes of those voters who timely cure their failure to abide by the photo ID requirement and to omit from the final count the votes of those voters who fail to timely cure their deficiencies.

Slip op. at 25 (emphasis added). Despite the Court making explicit that multiple "county boards" must conduct a cure process, the State Board has misread the Court's mandate as directing only a single county to conduct a cure process. The Court should correct the Board's misreading.

- 9 -

The State Board attempts to justify its misreading of the Court's explicit instructions by claiming that Judge Griffin only filed one "complete" protest in Guilford County. *See* Notice at 2 n.2. ("As indicated in the State Board's initial decision, only the Guilford County protest was complete by the deadline to file an election protest under state law."). The State Board's justification is baseless.

First, Judge Griffin filed protests in six counties before the statutory deadline set forth in N.C. Gen. Stat. § 163-182.9(b)(4). Indeed, the State Board's decision suggested timeliness concerns with protests filed in only three counties—Moore, Orange, and Richmond—but stopped short of ruling that any protests were untimely. (Doc.Ex.I 5373 n.4). In Judge Griffin's petition for judicial review that was filed with the Superior Court, Judge Griffin challenged the State Board's conclusion that any of his protests might be untimely. (Doc.Ex.II 269-71.) The State Board, in its arguments to the Superior Court, never contended that any of Judge Griffin's protests were actually untimely. (Doc.Ex.II 334-50). Therefore, the State Board has abandoned the argument that any protests were untimely.

Second, the six protests satisfied the statutory requirements when filed. Although Guilford County was the only protest that included a list of voters at the time of filing, the other protests nonetheless satisfied the filing requirements set forth in the General Statutes. To be clear, the election-protest statutes never discuss a

- 10 -

protest having to be "complete," much less define what constitutes being "complete." This is a new term that the State Board is trying to inject into the statutes.

Rather than requiring a protest to be "complete," section 163-182.10 explicitly states that a protest must merely be in "substantial compliance" with the filing requirements for election protests. Specifically, the statute says:

> The county board shall, as soon as possible after the protest is filed, meet to determine whether the protest *substantially complies* with G.S. 163-182.9 and whether it establishes probable cause to believe that a violation of election law or irregularity or misconduct has occurred. If the board determines that one or both requirements are not met, the board shall dismiss the protest. The board shall notify both the protester and the State Board of Elections. The protester may file an amended protest or may appeal to the State Board. If the board determines that both requirements are met, it shall schedule a hearing.

N.C. Gen. Stat. § 163-182.10(a)(1) (emphasis added).

Section 163-182.9 sets forth the requirements of an election protest. Those requirements include that the protest be in writing, be signed by the protester, include the protester's information, state whether the protest concerns a tabulation issue or a different irregularity, request a remedy, and be filed by a certain deadline. *Id.* § 163-182.9(b). There is no requirement that the protest name every affected voter. Thus, there is no debate that Judge Griffin's six protests substantially complied with the statutory requirements.

- 11 -

Finally, the Board cannot claim that the protests were not "complete" because, absent the lists being attached, the protests failed to establish probable cause. This Court clearly ruled that the protests established probable cause. *See* slip op. at 16-19. The Board cannot, under the guise of claiming a protest was not "complete," evade this Court's holding that probable cause was met. Indeed, Judge Griffin asked the State Board to subpoena the county boards for the lists of these voters during the State Board proceedings. (Doc.Ex.I 3682-83.)

Therefore, Judge Griffin requests that the Court clarify its mandate to explicitly direct the State Board to instruct the "county boards," slip op. at 25, in Guilford, Durham, Forsyth, Buncombe, New Hanover, and Cumberland counties to conduct the 30-day cure process as required by this Court and modified by the Supreme Court.

## B.    The State Board is limiting the number of Never Residents.

The State Board informed the federal court that there were only 266 Never Residents at issue. That very clearly contradicts this Court's mandate.

When Judge Griffin originally filed his protests, he only had data provided by the State Board. (*E.g.*, Doc.Ex.I 295-96, ¶¶ 10-12.) Based on the data provided by the State Board, Judge Griffin filed protests in 53 counties that had identifiable Never

- 12 -

Residents at the time. Those 53 protests listed a total of 266 Never Residents who had voted in the election.

Although Judge Griffin had received information from the State Board about Never Residents, the county boards had additional lists of Never Residents that the State Board failed to provide to Judge Griffin. (*E.g.*, Doc.Ex.I 296, ¶ 12 ("The NCSBE also explained that the spreadsheet provided was limited to overseas voters who submitted a ballot request through NCSBE's online system. Overseas voters who mailed in a ballot request would have done so to a county board of elections, and are thus not included in the information . . . .").) Therefore, Judge Griffin requested the Never Resident information from all 100 county boards. (Doc.Ex.I 3785-86.)

After filing the protests, some county boards began trickling in the requested information. Judge Griffin explained the following in his briefing to this Court:

> After filing the original protests, 35 counties responded to Judge Griffin's requests. Judge Griffin then supplemented 25 protests with this new data, which showed 138 additional Never Residents who voted in the election. Therefore, at least 405 Never Residents voted in the election.
>
> Since the Board rejected this protest, another five counties have produced records indicating an additional 111 Never Residents voted in the election, bringing the total 516. At this time, 60 counties have still not responded to public records requests on how many Never Residents voted in the election. It's possible that this irregularity changed the election's outcome, but because so many counties have yet to respond to public records requests, it is not certain. The final tally is an issue for the State Board to

- 13 -

> determine on remand, if this Court agrees with Judge Griffin on
> the legal merits of the protest.

Griffin Opening Br. at 8 n.2.[1]

In its federal court filing, the State Board announced that it has decided that it will address only the 266 Never Residents specifically named in original protests. Notice at 3. The Board's decision to ignore hundreds of additional Never Residents violates the Court's mandate.

There is no longer any doubt that Never Resident voting is unconstitutional. Slip op. at 32 ("[T]he challenged 'Never Resident' voters are ineligible to vote in non-federal North Carolina elections."). And their ineligibility to vote is not curable (unlike failing to provide a photo identification). *See id.* ("An absent person, who has never lived in North Carolina, cannot make North Carolina their domicile of choice."). To count the vote of even a single Never Resident violates the constitutional rights of all true residents. *James v. Bartlett*, 359 N.C. 260, 270, 607 S.E.2d 638, 644 (2005) ("To permit unlawful votes to be counted along with lawful ballots in contested elections effectively 'disenfranchises' those voters who cast legal ballots . . . ."). Therefore, *all* Never Residents must be identified and excluded from the vote count.

---

**1**    Copies of supplements provided to the State Board are included in the administrative record. (Doc.Ex.I 4473-4561.)

- 14 -

That is what this Court said in its opinion, which the Supreme Court left standing. The Court's instructions clearly directed the State Board to have the county boards remove *all* Never Residents from the final vote count. In particular, the Court "remand[ed] the matter to the Board to direct the county boards to identify the votes from 'Never Residents' and remove them from the final count of the 2024 election for Supreme Court Seat 6." Slip op. at 36. Notably, the Court's instructions to the State Board were not limited to any particular number of Never Residents. The clear instruction was to identify the ballots of Never Residents and discount them.

As with the protests challenging overseas voters without photo identification, the protests filed by Judge Griffin substantially complied with the statutory requirements for filing a protest. In addition, this Court has already declared that the protests established probable cause. Thus, there is no basis for limiting the discounting of votes by Never Residents to only those Never Residents named in the lists attached to the protests that Judge Griffin filed.

Therefore, Judge Griffin respectfully asks the Court to clarify its mandate to explicitly direct the State Board to identify ballots cast by Never Residents in all 100 counties, and then to exclude those ballots from the vote total.

- 15 -

C.    **The State Board plans to give Never Residents a "cure" opportunity.**

The State Board is also defying the Court's mandate regarding the treatment of votes from Never Residents.

The Court's instructions clearly directed the State Board to have the county boards remove all Never Residents from the final vote count. Slip op. at 36 (holding that the Board must "direct the county boards to identify the votes from 'Never Residents' and remove them from the final count of the 2024 election for Supreme Court Seat 6"). While overseas voters who failed to provide photo identification were eligible to cure the defect, *see id.*, the Court clearly chose not to offer a cure to Never Residents.

The State Board, though, informed the federal court that it will implement a cure process for Never Residents. The Board detailed the process as follows:

> First, in order to ensure each of the voters challenged are accurately identified as falling within this category, the Board intends to instruct the county boards for these fifty-three counties to assemble and review the FPCA forms submitted by these 266 voters to confirm that they did check the fourth box on the form.
>
> Next, the county boards will review the voter's registration record and voter history record to ensure that the voter in question does not have a record of registering previously or voting previously under a claim of residency in the county. A prior registration form would show that the voter attested, under penalty of perjury, to an in-county residence in the past. A record of voting in-person or using the absentee voting procedures under Article

- 16 -

20 of Chapter 163 would similarly show that the challenged voter attested, under penalty of perjury, to having resided within the county during a prior election. In either case, such records would demonstrate that these voters do not fit within the category of "never residents" under the order of the Court of Appeals. If such records exist, voters thus will be removed from the list of affected voters.

Finally, for those that remain after the first two identification steps, the Board will instruct the county boards to inform these voters via a mailing (and, if possible, by email and telephone) that their votes were protested and North Carolina courts have ordered the State Board to discount their vote cast in the 2024 general election for North Carolina Supreme Court Associate Justice because state records indicate they informed the State that they never resided in North Carolina when they submitted their absentee ballot request form in the 2024 general election. The mailing will also inform the voter that this litigation is ongoing and that the voter's obligations may therefore be subject to change. In order to ensure these challenged voters were properly identified and are afforded due process as part of this identification, these voters will then be provided thirty days from the date of the mailing to submit a sworn affidavit stating that they have resided in the county and identifying their prior residence address. A template affidavit will be included with the mailing. Any such voters who provide the affidavit of in-state residence do not belong in this category and their votes will not be identified for removal.

Notice at 4-5 (footnotes omitted).

The State Board's planned treatment of Never Residents violates the Court's mandate in several respects.

First, the county boards will attempt to purge the Never Resident lists. After identifying Never Residents based on the Federal Post Card Application that they

submitted to receive a ballot for the 2024 election, the county boards will then take it upon themselves to look for old registration forms and voting records that might suggest that a Never Resident was a North Carolina resident all. As the Board makes clear, any Never Resident that has either a prior registration or in-person voting history "will be removed from the list of affected voters." Notice at 4.

This process was nowhere contemplated in the Court's mandate. The Court's mandate was to be "strictly followed without variation or departure. *D & W*, 268 N.C. at 722, 152 S.E.2d at 202. The Board was not given free rein to imagine other procedures.

Second, the purge process makes no sense. A voter is a Never Resident only if he submitted a Federal Post Card Application to receive a ballot for the 2024 election and checked "I am a U.S. citizen living outside of the county, and I have never lived in the United States." In submitting the application, the Never Resident is required to "swear or affirm, under penalty of perjury," that "[t]he information on this form is true, accurate, and complete to the best of my knowledge. I understand that a material misstatement of fact in completion of this document may constitute grounds for conviction of perjury."[2] Thus, the most recent declaration of the Never

---

[2]    (Doc.Ex.I 295-96, 300); Federal Post Card Application, *available at* https://www.fvap.gov/uploads/fvap/forms/fpca.pdf.

- 18 -

Resident—made under penalty of perjury—is that he has *never* lived in the United States. The voter's own declaration, made under penalty of perjury, is conclusive evidence of the voter's residency. The mandate didn't give the Board any authority to contradict the voter's declaration.

Third, for any Never Resident that is not removed by this unsanctioned purge process, the county boards will attempt to contact the Never Resident by mail, phone, and email. This action also appears to go beyond the scope of the Court's mandate. Although the Court could have required the boards to provide notice to these voters, the Court did not direct the boards to do so. That is because these ballots cannot be cured. As the Court explained, there's nothing someone can do to become a resident of North Carolina if he's never lived here in the first place. Slip op. at 32.

Fourth, the State Board will implement a cure process for the Never Residents. These voters will be given a "template affidavit" and invited to submit the affidavit within 30 days from the date of mailing. The affidavit invites the Never Resident to admit that he or she committed perjury when he previously declared under oath that he had never lived in the United States. Under the Board's plan, any voter who returns the affidavit "will not be identified for removal."

- 19 -

This cure process is a repudiation of this Court's mandate. This Court chose to create a cure process for overseas voters who failed to provide photo identification and clearly chose not to create a cure process for Never Residents.

The State Board's purge and cure process defies this Court's mandate. Judge Griffin therefore respectfully asks that the Court clarify its mandate and clearly direct the county boards to discount the votes of any overseas voters who submitted a Federal Post Card Application and marked on the application that they "have never lived in the United States." The Court should also make clear to the Board that it is not to contact these voters and not to offer them an opportunity to cure.

## CONCLUSION

In light of the State Board's Notice filed in federal court, Judge Griffin respectfully asks the Court to issue a writ of mandamus to the State Board that elaborates on the Court's mandate and orders the Board to comply with it or, in the alternative, to issue an order clarifying the Court's mandate, as described herein.

This the 16th day of April, 2025.

/s/ Craig D. Schauer
Craig D. Schauer
N.C. State Bar No. 41571
cschauer@dowlingfirm.com

- 20 -

N.C. R. App. P. 33(b) Certification: I certify that all of the attorneys listed below have authorized me to list their names on this document as if they had personally signed it.

W. Michael Dowling
N.C. State Bar No. 42790
mike@dowlingfirm.com
Troy D. Shelton
N.C. State Bar No. 48070
tshelton@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail
Suite 260
Raleigh, North Carolina 27607
Telephone: (919) 529-3351

Philip R. Thomas
N.C. State Bar No. 53751
pthomas@chalmersadams.com
Chalmers, Adams, Backer & Kaufman,
PLLC
204 N Person Street
Raleigh, North Carolina 27601
Telephone: (919) 670-5185

*Counsel for the Honorable Jefferson Griffin*

- 21 -

# VERIFICATION

Pursuant to N.C. Gen. Stat. § 7A-98, counsel submits the following declara-

tion:

I declare under penalty of perjury under the laws of North Carolina that the

statements of fact in the foregoing document are true and correct to the best of my

knowledge.

Executed on April 16, 2025.

_____

Craig D. Schauer

- 22 -

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was electronically filed

and served this day by email as follows:

Ryan Park
rpark@ncdoj.gov
Nick Brod
nbrod@ncdoj.gov
Terence Steed
tsteed@ncdoj.gov

*Counsel for State Board of Elections*

Raymond M. Bennett
ray.bennett@wbd-us.com
Samuel B. Hartzell
sam.hartzell@whd-us.com

*Counsel for the Hon. Allison Riggs*

This the 16th day of April, 2025.

/s/ Craig D. Schauer
Craig D. Schauer

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| JUDGE JEFFERSON GRIFFIN, | |
| Plaintiff, | **STATE BOARD'S NOTICE OF REMEDIAL EFFORTS IN RESPONSE TO THE COURT'S APRIL 12, 2025 TEXT ONLY ORDER** |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, | **Case No. 5:24-cv-00731-M** |
| Defendant, | |
| and | |
| ALLISON RIGGS, et al., | |
| Intervenor-Defendants. | |

| | |
|---|---|
| NORTH CAROLINA DEMOCRATIC PARTY, | |
| Plaintiff, | |
| v. | **Case No. 5:24-cv-00699-M** |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, et al., | |
| Defendants. | |

| | |
|---|---|
| CARRIE CONLEY, et al., | |
| Plaintiffs, | |
| v. | **Case No. 5:25-cv-00193-M** |
| ALAN HIRSCH, et al, | |
| Defendants. | |

1

Defendant the North Carolina State Board of Elections respectfully submits this notice in response to this Court's April 12, 2025 order directing the Board to inform "the court of the scope of its remedial efforts, including the number of potentially affected voters and the counties in which those voters cast ballots." The State Board is aware of pending appeals concerning this Court's decision to require the State Board to implement the North Carolina state courts' orders while refraining from certifying any result of the election at issue in this case. Various parties argue that further remedial steps to execute the state courts' orders may, in and of themselves, implicate federal constitutional questions. However, pursuant to this Court's April 12 and April 15, 2025 orders, the State Board summarizes how it intends to approach this administrative remedial process unless and until directed to do otherwise by court order. The State Board will promptly report any substantive modifications to this Court or another court with jurisdiction at the time.

## I.    Identification of Affected Voters.

Pursuant to the North Carolina Court of Appeals Order, as modified by the North Carolina Supreme Court, the first step the State and county boards must take is to identify the challenged voters in the two categories of protests that remain.[1]

For Plaintiff Judge Griffin's protests concerning absentee ballots cast by military and overseas voters who did not submit a copy of a photo ID or an exception form with their ballots, these protests affect potentially up to 1,409 voters in Guilford County.[2]

---

[1] Certain of the voters referenced in Plaintiff's protests appear to have been listed several times. The figures below may therefore count the same voter multiple times. In addition, certain voters appear to be included within both categories of protests. These voters will receive both forms of notice.

[2] As indicated in the State Board's initial decision, only the Guilford County protest was complete by the deadline to file an election protest under state law.

2

In order to ensure each of the voters challenged are accurately identified as falling within this category, the Board intends to instruct the Guilford County Board of Elections to assemble and review the documentation submitted with the absentee ballots cast by each of these 1,409 voters, to confirm that these voters did not submit a copy of a photo ID or an exception form with their absentee ballots.[3]  For those who did submit a photo ID or exception form when they voted, they will necessarily not fall within the category challenged and no further action will be required with respect to these voters.  For those who did not submit such documentation, the Board will instruct the county board to provide notice to these voters as described below.

For Plaintiff's protests concerning absentee ballots cast by overseas voters who possibly checked the fourth box on question 1 of their federal Voter Registration and Absentee Ballot Request / Federal Post Card Application ("FPCA")[4] form that states, "I am a U.S. citizen living outside the country, I have never lived in the United States," these protests potentially affect up to 266 voters in fifty-three counties.[5]

---

[3] While the majority of military and overseas voters utilized the online portal to submit their absentee ballots in the election, some submitted ballots via email, mail, or fax. Because the online portal is not currently configured to accept attachments, only the voters within these latter subcategories may have submitted additional documentation, even though not required at the time.

[4] See FPCA Form, https://tinyurl.com/4rxkjvsx, last visited April 15, 2025.

[5] Alamance (one voter), Alleghany (one voter), Ashe (two voters), Avery (one voter), Brunswick (one voter), Buncombe (nine voters), Burke (two voters), Cabarrus (three voters), Caldwell (one voter), Carteret (two voters), Catawba (three voters), Cleveland (one voter), Columbus (one voter), Cumberland (six voters), Currituck (one voter), Dare (one voter), Davie (one voter), Duplin (one voter), Durham (twenty-three voters), Edgecombe (one voter), Forsyth (fifteen voters), Gaston (one voter), Guilford (fifteen voters), Halifax (one voter), Harnett (one voter), Henderson (seven voters), Iredell (seven voters), Jackson (one voter), Johnston (one voter), Lee (one voter), Lenoir (one voter), Lincoln (four voters), Madison (two voters), Mecklenburg (twenty-seven voters), Moore (eight voters), Nash (one voter), New Hanover (eight voters), Onslow (three voters), Orange (thirty-seven voters), Pender (one voter), Person (one voter), Pitt (two voters), Randolph (one voter), Robeson (one voter), Rutherford (one voter), Scotland (one

3

First, in order to ensure each of the voters challenged are accurately identified as falling within this category,[6] the Board intends to instruct the county boards for these fifty-three counties to assemble and review the FPCA forms submitted by these 266 voters to confirm that they did check the fourth box on the form.

Next, the county boards will review the voter's registration record and voter history record to ensure that the voter in question does not have a record of registering previously or voting previously under a claim of residency in the county. A prior registration form would show that the voter attested, under penalty of perjury, to an in-county residence in the past.[7] A record of voting in-person or using the absentee voting procedures under Article 20 of Chapter 163 would similarly show that the challenged voter attested, under penalty of perjury, to having resided within the county during a prior election. In either case, such records would demonstrate that these voters do not fit within the category of "never residents" under the order of the Court of Appeals. If such records exist, voters thus will be removed from the list of affected voters.

---

voter), Swain (one voter), Union (three voters), Vance (one voter), Wake (thirty-nine voters), Warren (one voter), Watauga (seven voters), and Wilson (three voters).

[6] Recent news reports and a sample internal review of the voter history of these voters indicates that some have resided in the state previously. *See* Bryan Anderson, *Longtime N.C. Voters May Have Their Ballots Wrongfully Tossed in Supreme Court Race*, The Assembly (Apr. 13, 2025), https://tinyurl.com/mpadw2zw; Judd Legum et al., *North Carolina Supreme Court throws out hundreds of ballots based on flawed data*, Popular Information (Apr. 15, 2025), https://tinyurl.com/y2wf44be; Paige Masten, *NC Supreme Court's ruling in Griffin case has some big, glaring problems*, The Charlotte Observer (Apr. 15, 2025, 10:18 AM), https://tinyurl.com/hnfzanjb. It is suspected that these voters were either incorrectly identified as never residents or inadvertently indicated that they never lived in the United States. Thus, these steps are necessary to ensure that the State Board is in compliance with the Court of Appeals order directing the State and county boards to identify the voters who it ruled are not eligible to vote under state law for failure to satisfy a residency requirement.

[7] *See* North Carolina Voter Registration Application Form, https://tinyurl.com/jjcnk9bc, last visited April 15, 2025.

4

Finally, for those that remain after the first two identification steps, the Board will instruct the county boards to inform these voters via a mailing (and, if possible, by email and telephone) that their votes were protested and North Carolina courts have ordered the State Board to discount their vote cast in the 2024 general election for North Carolina Supreme Court Associate Justice because state records indicate they informed the State that they never resided in North Carolina when they submitted their absentee ballot request form in the 2024 general election. The mailing will also inform the voter that this litigation is ongoing and that the voter's obligations may therefore be subject to change. In order to ensure these challenged voters were properly identified and are afforded due process as part of this identification, these voters will then be provided thirty days from the date of the mailing to submit a sworn affidavit stating that they have resided in the county and identifying their prior residence address. A template affidavit will be included with the mailing. Any such voters who provide the affidavit of in-state residence do not belong in this category and their votes will not be identified for removal.[8]

## II.    Notice to Affected Voters.

For challenged voters whose votes were challenged for having voted as overseas or military voters without meeting the photo ID requirement, the State Board will direct the county boards to prepare notices to these voters via a mailing (and, if possible, by email and telephone) about their need to submit a copy of their photo identification, or an affidavit referred to as a Photo ID Exception Form. For ease of administration, this mailing concerning the photo ID

---

[8] Under normal state election protest procedures, a voter challenged under an election protest would be guaranteed notice and an evidentiary hearing to contest the allegations of ineligibility in the protest. *See* N.C. Gen. Stat. § 163-182.10(b)–(c). The Court of Appeals order does not appear to permit this statutory process to play out. However, the State Board interprets the order's direction for the county board to "identify the votes from 'Never Residents'" to afford any such challenged voters an opportunity to demonstrate to the county board that their votes should not be so identified, because they are not, in fact, "Never Residents."

5

requirement will be sent to voters at the same time as the other mailing referenced above.  A blank exception form will be included with this mailing, which is included with all absentee ballot packages and is part of the standard cure process for civilian absentee voters who need to cure a deficiency with their photo identification documentation.

These voters will specifically be notified that North Carolina state courts have ordered the State Board provide them notice that their vote cast in the 2024 general election for North Carolina Supreme Court Associate Justice will only count if, within thirty days of the date that the mailing referenced above was sent, these voters submit a copied photo ID or exception form. The mailing will also inform the voter that this litigation is ongoing and the voter's obligations are subject to change.  Voters will be informed that copied IDs or exception forms can be submitted by mail, fax, or submitted electronically via an online portal or email.

The State Board has begun work with the vendor that maintains its online portal for processing military and overseas ballots to create a means by which voters may securely submit copies of photo IDs and exception forms online.  So as to ensure as orderly a process as possible, and to avoid confusion, the State Board will not instruct the county boards to send out the notice to these voters until this portal is ready. The State Board anticipates the portal to be ready within a week of entering into a contract.  Also, to avoid confusion regarding the deadline for a voter to respond, the State Board will instruct the county boards to send out all notices on the same date, so that all challenged voters will have to respond within the same thirty-day period.

### III.    Identifying Ballots With Votes That May Be Discounted.

For challenged overseas and military voters who voted without providing an ID or claiming an exception and who now submit a photo ID or exception form, the county board will

proceed under 08 N.C. Admin. Code 17 .0109 for the review of such photo ID documentation.[9] For any challenged military or overseas voters who, within thirty days of the notice being sent, fails to provide any photo ID documentation or who provides documentation that is not acceptable under 08 N.C. Admin. Code 17 .0109, the State Board will instruct the county board to retrieve their ballots for further action consistent with an order from this Court or another court with jurisdiction.

For challenged overseas voters who are identified as having never resided in North Carolina, the State Board will instruct the county board to retrieve their ballots for further action consistent with an order from this Court or another court with jurisdiction.

Until this Court or another court with jurisdiction directs the State Board to change the vote count after having identified the ballots as described above, the State Board will direct the county boards not to ascertain or discount the votes of any such ballots, and to not reveal to anyone how any such ballots were voted.

Should this Court require further information, the State Board stands ready to provide it upon request.

Respectfully submitted, this 15th day of April, 2025.

Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
TSteed@ncdoj.gov
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Phone: 919-716-6900
Fax: 919-716-6758

*Counsel for the State Board*

---

[9] With the exception of paragraph (d) of the Rule, as the Court of Appeals has now determined that provision is invalid.

7